**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**PENN-STAR INSURANCE COMPANY,**

**Plaintiff,**

**v.**

**Case No. 20-2433-JAR-TJJ**

**J&J PILOT CARS, LLC, R&H LOGISTICS, INC., GARY LEE PLUMMER, and RICHARD R. SMITH,**

**Defendants.**

**MEMORANDUM AND ORDER**

Plaintiff Penn-Star Insurance Company ("Penn-Star") brings this declaratory judgment action to determine whether it has a duty to defend and indemnify Defendants in underlying litigation pending in Wilson County, Kansas state court relating to an accident that damaged a highway overpass. Before the Court is Defendants R&H Logistics, Inc.'s and Richard R. Smith's Motions for Judgment on the Pleadings (Docs. 16, 23). Also before the Court is Plaintiff's Motion for Leave to File Sur-Reply (Doc. 34). The motions are fully briefed and the Court is prepared to rule. For the reasons explained below, Plaintiff's motion for leave to file surreply is granted; Defendants' motions for judgment on the pleadings are denied.

## I. Standard

The standard for a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is the same as that applied to a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).[1] To survive a motion to dismiss brought under Rule 12(b)(6), a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above the speculative level"

[1] *Colony Ins. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012).

and must include "enough facts to state a claim to relief that is plausible on its face."[2] "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' are insufficient."[3] The court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[4]

The Supreme Court has explained the analysis as a two-step process. First, the court "must take all the factual allegations in the complaint as true, [but is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'"[5] Thus, the court must determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[6] Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[7] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[8]

Finally, if the Court on a Rule 12(c) motion looks to matters outside the pleadings, it generally must convert the motion to a Rule 56 motion for summary judgment.[9] However, the Court may consider documents that are referred to in the complaint if they are central to the plaintiff's claim and the parties do not dispute their authenticity.[10] Here, the Court considers the

---

[2] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[3] *Estate of Lockett ex rel. Lockett v. Fallin*, 841 F.3d 1098, 1107 (10th Cir. 2016) (quoting *Twombly*, 550 U.S. at 555).

[4] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

[5] *Id*. (quoting *Twombly*, 550 U.S. at 555).

[6] *Id.* at 678–79.

[7] *Id*. at 679.

[8] *Id.* at 678.

[9] Fed. R. Civ. P. 12(d); *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384–85 (10th Cir. 1997).

[10] *See Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007); *GFF Corp.*, 130 F.3d at 1384–85.

documents attached to the Complaint: the insurance policy and pleadings from the underlying litigation.[11] The Court does not consider the photograph attached to Plaintiff's response.[12]

## II. Factual Allegations

The following facts are either alleged in the Complaint or taken from the documents attached thereto. The well-pled facts alleged in the Complaint are assumed to be true for purposes of deciding this motion.

On July 19, 2019, Julie L. Lorenz, Secretary of the Kansas Department of Transportation ("KDOT"), filed a Petition for Damages against R&H Logistics, Inc. ("R&H") and Richard R. Smith (collectively, the "R&H parties"), in the District Court of Wilson County (the "Underlying Lawsuit"). The Secretary alleges that on July 19, 2017, Smith was operating R&H's 2012 Kenworth truck transporting a 13,000-gallon water tank,[13] traveling westbound on U.S. 400 highway in Wilson County, Kansas under a superload permit issued by KDOT. When Smith drove under the U.S. 75 highway overpass, the top of the water tank struck the bottom of the overpass, causing damage. The Secretary alleges that the R&H parties failed to comply with the superload permit, which required R&H to exit U.S. 400 highway at the U.S. 75 highway overpass, and then re-enter U.S. 400 highway at the next westbound entrance after U.S. 75 highway. The Secretary alleges a claim for negligence with damages in excess of $900,000.

On May 29, 2020, the R&H parties filed a Third-Party Petition in the Underlying Lawsuit asserting claims against J&J Pilot Cars, LLC ("J&J") and Gary Plummer (collectively, the "J&J parties"). The R&H parties assert the load they were transporting on July 19, 2017 originated in

---

[11] *See* Docs. 1-1, 1-2, 1-3.

[12] Doc. 32-1.

[13] Defendants refer to this as a "water truck" in their briefs. The pleadings in the Underlying Lawsuit refer to it as a water tank. *See* Doc. 1-2 ¶ 14.

Fort Scott, Kansas and its destination was Sawyer, Oklahoma. They allege that R&H contracted with J&J to provide escort services for R&H's superload; J&J assigned Plummer to operate the escort car, which was also assigned a permit by the Secretary. The R&H parties allege that Plummer was driving ahead of Smith and knew that the superload was required to exit at the U.S. 75 highway overpass, yet Plummer neither exited nor alerted Smith to exit, despite both vehicles being equipped with CB radios that allowed them to communicate during the trip. Therefore, the R&H parties allege that the J&J parties were negligent and proximately caused the overpass damage:

> [T]he proximate cause of any damage to the US-75 Highway overpass above US-400 Highway was [the J&J parties'] failure to take the exit from US-400 Highway to bypass the US-75 Highway overpass while traveling in front of Smith and their failure to alert Smith to take the exit from US-400 Highway to bypass the US-75 overpass before Smith reached the overpass."[14]

Penn-Star issued Commercial General Liability ("CGL") Policy No. PAC7125381 ("the Policy"), with a policy period of February 23, 2017 to February 23, 2018, to J&J. At all relevant times, Plummer was an insured under the Policy. The Policy provides for coverage as follows:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if:
>
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" . . . .[15]

[14] Doc. 17-2 ¶ 41.

[15] Doc. 1-3 at 20, § I, Coverage A, ¶ 1.a.

The Policy provides an exclusion for "Aircraft, Auto Or Watercraft," which applies to:

> "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading and unloading."
>
> This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured. . . .[16]

The Policy contains several endorsements that change the Policy. The auto exclusion endorsement changes the policy by deleting the "Aircraft, Auto, Or Watercraft" exclusion "in its entirety and replac[ing] it with the following," in pertinent part:

> This insurance does not apply to:
>
> "Bodily injury" or "property damage" arising out of the ownership, maintenance use by any person or entrustment to others, of any aircraft, "auto", or watercraft.
>
> This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved an aircraft, "auto", or watercraft. Use includes operation and "loading or unloading".
>
> This exclusion does not apply to:
> . . . .
>
> (4) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph f.(2) or f.(3) of the definition of "mobile equipment".[17]

[16] *Id.* at 23, § I, Coverage A, ¶ 2.g

[17] *Id.* at 50.

The Policy also contains an exclusion for "Mobile Equipment," which applies to, in pertinent part, "'property damage' arising out of . . . [t]he transportation of 'mobile equipment' by an 'auto' owned or operated by or rented or loaned to any insured."[18]

Under Section V of the Policy, "auto" is defined as:

> a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or
>
> b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.
>
> However, "auto" does not include "mobile equipment".[19]

The term "property damage," is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property."[20] An "occurrence" is "an accident."[21] And "suit" is defined as: "a civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged."[22] "Mobile equipment" is defined as:

> [A]ny of the following types of land vehicles, including any attached machinery or equipment:
>
> a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;
>
> . . . .
>
> d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

[18] *Id.* at 23, § I, Coverage A, ¶ 2.h(1).

[19] *Id.* at 32, § V, ¶ 2.

[20] *Id.* at 34, § V, ¶ 17.

[21] *Id.* at 34, § V, ¶ 13.

[22] *Id.* at 35, § V, ¶ 18.

> (1) Power cranes, shovels, loaders, diggers or drills; or
> (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;
>
> . . . .
>
> However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".[23]

Penn Star seeks a declaratory judgment that it has no duty to defend or indemnify under the Policy because the Third-Party Petition in the Underlying Lawsuit asserts a claim for "property damage" "arising out of" the "ownership, maintenance or use by any person" of "any . . . auto," which is excluded from coverage by the Policy's auto exclusion endorsement.

## III. Discussion

The R&H Defendants move for judgment on the pleadings, arguing that as a matter of law, Penn-Star has a duty to defend and indemnify under the Policy. "A federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it sits."[24] "In Kansas, the construction of a contract is governed by the law of the state in which the contract was made."[25] "A contract is made where the last act necessary for its formation occurs."[26] There is no dispute here that the insurance contract was made in Missouri and should be interpreted under Missouri law.

---

[23] *Id.* at 33–34, § V, ¶ 12 (emphasis added).

[24] *Phila. Indem. Ins. Co. v. Kan. City Home Care, Inc.*, 139 F. Supp. 2d 1194, 1197 (D. Kan. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941)).

[25] *Id*. (citing *Simms v. Metro. Life Ins. Co.,* 685 P.2d 321, 324 (Kan. Ct. App. 1984)).

[26] *Found. Prop. Invs., LLC v. CTP, LLC*, 159 P.3d 1042, 1046 (Kan. Ct. App. 2007) (citation omitted).

Under Missouri law, an insurer's duty to defend "arises if the allegations in the petition and/or the facts the insurer knew or were reasonably apparent to the insurer at the outset of the case are potentially covered by the insurance policy."[27] Thus, the "duty to defend arises only from potential coverage based on facts: (1) alleged in the petition; (2) the insurer knows at the outset of the case; or (3) that are reasonably apparent to the insurer at the outset of the case."[28] If "there is no duty to defend, there is no duty to indemnify."[29] Where the insurer seeks to avoid coverage based on an exclusion, it bears the burden to show the exclusion applies.[30] "Where the pleadings show on their face the exclusion's applicability, the insurer's burden is met."[31]

The interpretation of an insurance contract is a question of law.[32] The same rules apply to insurance contracts as other contracts.[33] The Court is required to read the contract as a whole, giving the language its plain and ordinary meaning.[34] If the language of the insurance contract is unambiguous, it is enforced as written.[35] But if "[a]n insurance policy is ambiguous 'when, due to duplicity, indistinctness, or uncertainty in the meaning of the words used, the policy is

---

[27] *Endurance Am. Specialty Ins. Co. v. Brown*, –F. Supp. 3d–, 2020 WL 6947519, at *5 (W.D. Mo. Mar. 19, 2020) (citing *Allen v. Cont'l W. Ins. Co.*, 436 S.W.3d 548, 552 (Mo. 2014) (en banc)).

[28] *Allen*, 436 S.W.3d at 553.

[29] *Brown*, 2020 WL 6947519, at *3 (quoting *Trainwreck W. Inc. v. Burlington Ins. Co.*, 235 S.W.3d 33, 44 (Mo. Ct. App. 2007)).

[30] *Id.* (citing *Superior Equip. Co. v. Md. Cas. Co.*, 986 S.W.2d 477, 482 (Mo. Ct. App. 1998)).

[31] *Id.* (citing *Ira E. Berry, Inc. v. Am. States Ins. Co.*, 563 S.W.2d 514, 516 (Mo. Ct. App. 1978)).

[32] *Gohagan v. Cincinnati Ins. Co.*, 809 F.3d 1012, 1015 (8th Cir. 2016) (citing *McCormack Baron Mgmt. Servs., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 171 (Mo. 1999)).

[33] *Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 160 (Mo. 2007) (en banc).

[34] *Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 903 (Mo. Ct. App. 2015); *see also Harrison v. MFA Mut. Ins. Co.*, 607 S.W.2d 137, 142 (Mo. 1980) (en banc) ("[W]here language in an insurance contract is unequivocal, it is to be given its plain meaning notwithstanding the fact that it appears in a restrictive provision of a policy.").

[35] *Blumer v. Auto. Club Inter-Ins. Exch.*, 340 S.W.3d 214, 218 (Mo. Ct. App. 2011) (citing *Heringer v. Am. Family Mut. Ins. Co.*, 140 S.W.3d 100, 102 (Mo. Ct. App. 2004)).

reasonably open to different constructions," the language is construed against the insurer.[36] "To test whether the language used in the policy is ambiguous, the language is considered in the light in which it would normally be understood by the lay person who bought and paid for the policy."[37] "Mere disagreement over the interpretation of the terms of a contract does not create an ambiguity."[38] The Court should not "unreasonably distort the language of a policy or exercise inventive powers for the purpose of creating an ambiguity when none exists."[39] Exclusionary clauses are interpreted strictly against the insurer.[40]

The Complaint seeks declaratory relief on the basis that the auto exclusion endorsement in the Policy excludes coverage. Defendants argue that the auto exclusion endorsement is ambiguous when applied to the water tank hauled by R&H's truck; when the endorsement is read in conjunction with the "auto" and "mobile equipment" definitions, it is ambiguous and should therefore be subject to a "reasonable expectation" analysis. Plaintiff responds that this case does not involve "mobile equipment" and R&H's truck and J&J's escort car fit squarely within the unambiguous definition of "auto." The Court carefully considers the language of the auto exclusion endorsement below in determining that Plaintiff sufficiently pleads that it applies based on the facts alleged in the Underlying Lawsuit.

---

[36] *Id.* (quoting *Miller v. O'Brien*, 168 S.W.3d 109, 115 (Mo. Ct. App. 2005)) (citing *Heringer*, 140 S.W.3d at 102–03).

[37] *Id.* (quoting *Herringer*, 140 S.W.3d at 103).

[38] *Mendota Ins. Co.*, 456 S.W.3d at 903 (citing *Thiemann v. Columbia Pub. Sch. Dist.*, 338 S.W.3d 835, 840 (Mo. Ct. App. 2011)).

[39] *Endurance Am. Specialty Ins. Co. v. Brown*, –F. Supp. 3d–, 2020 WL 6947519, at *3 (W.D. Mo. Mar. 19, 2020) (quoting *Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 163 (Mo. 2007) (en banc)).

[40] *Adams v. Certain Underwriters at Lloyd's of London*, 589 S.W.3d 15, 27 (Mo. Ct. App. 2019) (citing *Centermark Props., Inc. v. Home Indem. Co.*, 897 S.W.2d 98, 100–01 (Mo. Ct. App. 1995)).

**A. "Arising out of" and "Use"**

Defendants insist that the endorsement containing the auto exclusion, when read in conjunction with the definitions of "auto" and "mobile equipment" is uncertain and confusing, and that a reasonable insured would expect that the water tank the truck was carrying in this case would be covered by the Policy because it falls under the "mobile equipment" definition, and is therefore exempt from the auto exclusion. Plaintiff responds that the endorsement applies to both J&J's escort car and R&H's truck, relying on the "arising out of . . . the use . . . of any auto" language in the endorsement. Thus, before the Court can address the "auto" or "mobile equipment" definitions, it must first consider how the language "arising out of the use of any auto" should be construed under Missouri law.

**1. Defendants' Motion for Leave to File a Surreply**

Defendants' original brief contains no analysis about the "arising out of" or "use" language in the endorsement. Nor does it explain why the water tank should be considered for purposes of the insurance coverage analysis in this case. Plaintiff's response correctly focuses on the "arising out of" and "use" Policy language, and cites to Missouri caselaw construing those provisions. Plaintiff contends that the overpass damage here did not "arise out of" the "use" of the water tank, which was merely passive cargo attached to the truck. Plaintiff argues the damage arose out of the use of the other two vehicles—traveling under the overpass despite the permits' instructions to exit the highway. For the first time in the reply, Defendants propose the Court utilize the so-called Appleman test,[41] to determine whether liability arises out of the "use"

[41] Doc. 33 at 2–6.

of a vehicle, citing an unpublished Michigan Court of Appeals decision.[42] Given this new analysis, Plaintiff moves for leave to file a surreply to address this limited issue.

Surreplies require leave of court and are only granted under "rare circumstances."[43] "For example, when a moving party uses their reply to present new material—i.e., new evidence or new legal arguments—and if the court relies on that new material, it should give the nonmoving party an opportunity to respond."[44] While it is true that citing a new case in reply to support a legal theory included in an opening brief does not warrant a surreply,[45] Defendants go well beyond new case citations. Defendants' opening brief presumes without analysis that the water tank is the only relevant instrumentality of the property damage alleged in the Underlying Lawsuit. Only after Plaintiff's response that the "mobile equipment" definition is irrelevant because it denied coverage based on the Policy's "arising out of" and "use" language as applied to the two vehicles involved in the accident did Defendants provide authority and analysis on any legal test that purportedly resolves this issue. This is a new argument and Plaintiff is granted leave to file a surreply to address it. The Court therefore considers the surreply attached to Plaintiff's motion for leave in resolving this issue.

**2. "Arising out of"**

Turning to the language of the endorsement, it excludes "'property damage' arising out of the ownership, maintenance or use by any person or entrustment to others, of any aircraft, 'auto',

[42] *See, e.g.*, *Grange Ins. Co. of Mich. v. MS Escort Truck Servs., LLC*, Nos. 338260, 338262, 338277, 338279, 2018 WL 3186230, at *4–5 (Mich. Ct. App. June 28, 2018).

[43] *COPE v. Kan. State Bd. of Educ*., 71 F. Supp. 3d 1233, 1238 (D. Kan. 2014) (citation omitted).

[44] *James v. Boyd Gaming Corp.*, –F. Supp. 3d–, 2021 WL 794899, at *5 (D. Kan. Mar. 2, 2021) (first citing *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005); then citing *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003); and then citing *EEOC v. Int'l Paper Co.*, No. 91-2017-L, 1992 WL 370850, at *10 (D. Kan. Octo. 28, 1992)).

[45] *See id.*

or watercraft."[46] There is no need to determine whether this language is ambiguous; such a "determination is not required where the policy language has already been judicially defined."[47] As the Missouri Court of Appeals explained in *Walden v. Smith*, "Missouri courts have judicially defined both 'arising out of' and 'use,'" thus, "[t]he judicial definitions assigned to these policy terms are controlling."[48]

Because this is a diversity case, absent controlling precedent, the Court "must attempt to predict how the state's highest court would resolve the issue."[49] Instead of aiding the Court in this endeavor, Defendants ask the Court to rely on a test used by Michigan courts, and incorrectly argue that Missouri courts apply the same test to "analyze automobile coverage issues."[50] Michigan courts apply the Appleman test to determine whether there was a sufficient causal connection between an injury and the use of a motor vehicle:

> 1. The accident must have arisen out of the inherent nature of the automobile, as such; 2. The accident must have arisen within the natural territorial limits of an automobile, and the actual use, loading, or unloading must not have terminated; 3. The automobile must not merely contribute to cause the condition which produces the injury, but must, itself, produce the injury.[51]

---

[46] Doc. 1-3 at 50.

[47] *Walden v. Smith*, 427 S.W.3d 269, 274 (Mo. Ct. App. 2014) (citing *Am. Fam. Ins. Co. v. Wemhoff*, 972 S.W.2d 402, 405 (Mo. Ct. App. 1998)).

[48] *Id.*

[49] *See Royal Maccabees Life Ins. Co. v. Choren*, 393 F.3d 1175, 1180 (10th Cir. 2005) (citing *FDIC v. Schuchmann*, 235 F.3d 1217, 1225 (10th Cir. 2000)).

[50] Doc. 33 at 2.

[51] *Grange Ins. Co. of Mich. v. MS Escort Truck Servs., LLC*, Nos. 338260, 338262, 338277, 338279, 2018 WL 3186230, at *4 (Mich. Ct. App. June 28, 2018) (quoting *Thornton v. Allstate Ins. Co.*, 391 N.W.2d 320, 323 (Mich. 1986)).

Defendants incorrectly assert that Missouri courts apply this three-part test. The cases they cite for this proposition say no such thing.[52] Instead, they generally discuss Missouri's interpretation of the "arising out of" policy language at issue here.[53] Indeed, many Missouri cases discuss this policy language, as catalogued in the *Walden* decision.[54] The Court declines Defendants' invitation to apply Michigan law. Instead, the Court predicts that the Missouri Supreme Court would follow *Walden* and the cases discussed therein when construing the terms "arising out of" and "use" in this endorsement.[55]

The "arising out of" language in the Policy requires a "causal relationship . . . between the accident or injury and the ownership, maintenance, or use of that vehicle."[56] "Arising out of" insurance language has been interpreted by Missouri courts broadly to mean "originating from" or "having its origins in" or "growing out of" or "flowing from."[57] It is

> more expansive than the words "caused by" . . . . When the former phrase is used in a liability policy, an unbroken chain of events need not be established but rather a simple casual [sic] relationship must exist between the accident or injury and the activity of the insured. The causation standard is not elevated to the strict "direct and proximate cause" standard of general tort law.[58]

---

[52] *See Ryder Truck Rental, Inc. v. U.S. Fidelity & Guar. Co.*, 527 F. Supp. 666, 669 (E.D. Mo. 1981); *Schmidt v. Utils. Ins. Co.*, 182 S.W.2d 181, 183 (Mo. 1944).

[53] *Ryder Truck Rental, Inc.*, 527 F. Supp. at 669; *Schmidt*, 182 S.W.2d at 183.

[54] *Walden v. Smith*, 427 S.W.3d 269, 274–83 (Mo. Ct. App. 2014) (collecting cases).

[55] Oddly, neither party cited nor discussed this decision. Although *Walden* involved an automobile insurance policy, its coverage provision uses the same language as the auto exclusion in this CGL Policy. *See id.* at 273. The *Walden* court collected cases addressing this language in the context of both coverage and exclusionary provisions, including several of the cases discussed by the parties in their briefs. *Id.* at 274–85.

[56] *Ryder Truck Rental, Inc.*, 527 F. Supp. at 669.

[57] *See Colony Ins. Co. v. Pinewoods Enters., Inc.*, 29 F. Supp. 2d 1079, 1083 (E.D. Mo. 1998); *Walton Const. Co. v. Liberty Mut. Fire Ins. Co.*, No. 09-0706-CV-W-ODS, 2010 WL 4625734, at *2 (W.D. Mo. Nov. 8, 2010).

[58] *Colony Ins. Co.*, 29 F. Supp. 2d at 1083 (first citing *Martin v. Cameron Mut. Ins. Co.*, 763 S.W.2d 710, 711 (Mo. Ct. App. 1989); then citing *Bituminous Cas. Corp. v. Aetna Life & Cas. Co.*, 599 S.W.2d 516, 518 (Mo. Ct. App. 1980); and then citing *Ryder Truck Rental, Inc.*, 527 F. Supp. at 669).

As in *Walden*, the "arising out of" language in this endorsement requires a causal relationship between the property damage ("flowing from," "growing out of," etc.) and the "use" of any "auto."[59]

**3. "Use"**

Plaintiff does not contend that the exclusion applies to "ownership" or "maintenance" of any "auto." There appears no dispute that application of the endorsement turns on whether there was "use" of "any auto." Although "use" is not separately defined in this Policy, the endorsement states that "[u]se includes operation and 'loading and unloading.'" Neither party contends that the "loading and unloading" part of this definition is at issue here.

The court in *Walden* collected Missouri caselaw interpreting the term "use" in the context of similar policy provisions and explained that it "is a broad term which includes within its scope any means by which a vehicle may be employed or put into service consistent with its nature as a vehicle including, but not limited to, the operation of, driving of, or riding in a vehicle."[60] When construed together with the term "arising out of," *Walden* set forth several "[c]learly established legal principles . . . [to] assist in defining the outer parameters of the required causal relationship."[61] The court explained:

> The requirements that a vehicle's use be the "instrumentality" of an injury, and that an injury arise out of an "inherent use of a vehicle" simply reinforce that a causal relationship must exist between injury and use of a vehicle. For an accident causing injury to "arise out of the use" of a vehicle, the purpose for which the vehicle is being employed must be consistent with the vehicle's inherent nature, and must create a condition which contributes to cause the accident. "'Automobile insurance contracts protect against liability for accidents arising out of the 'use' of vehicle (sic) but they cannot be held to protect

[59] *See Walden*, 427 S.W.3d at 276.

[60] *Id.* at 277.

[61] *Id.* at 277–79.

> against liability for accidents where the use of the automobile was not connected with the accident or the creation of a condition that caused the accident.'"
>
> Missouri cases have thus consistently determined whether an accident causing injury "arises out of the use" of a vehicle by evaluating the extent to which the particular use of the vehicle contributed to create a condition that caused the accident at issue.[62]

Defendants argue, in the context of applying Michigan's test, that the accident did not arise out of the use of J&J's escort car or R&H's truck. They argue that the Third-Party Petition's allegations against the J&J parties relates to their professional escort duties and that the property damage did not arise out of "the inherent transportation function of their vehicles as such."[63] The Court disagrees. The Third-Party Petition alleges that J&J proximately caused the overpass damage by failing to take the exit at U.S. 400 highway "while traveling in front of Smith" and failing to alert Smith to take the exit before he reached the overpass. The use of the escort car ("traveling" ahead of R&H's truck) created the condition (the truck following the escort car under the overpass) that contributed to cause the occurrence. Similarly, the use of the R&H truck (driving and hauling the water tank) created the condition (the water tank passing under the overpass and striking it) that contributed to cause the occurrence. These vehicles were not merely the "situs" of the property damage—the overpass damage happened while Smith and Plummer were using the vehicles for their intended purpose, and their use created the condition that allegedly caused the overpass damage.[64]

---

[62] *Id.* at 279 (quoting *Bituminous Cas. Corp. v. Aetna Life & Cas. Co.*, 599 S.W.2d 516, 519 (Mo. Ct. App. 1980) (emphasis omitted)).

[63] Doc. 33 at 3–4 (quoting *Grange Ins. Co. of Mich. v. MS Escort Truck Servs., LLC*, 2018 WL 3186230, at *5 (Mich. Ct. App. June 28, 2018)).

[64] *Cf. Cameron Mut. Ins. Co. v. Ward*, 599 S.W.2d 13, 14 (Mo. Ct. App. 1980) (finding vehicle was merely the "situs" of the accidental discharge of a rifle that caused the injury); *Pope v. Stolts*, 712 S.W.2d 434, 435–36 (Mo. Ct. App. 1986) (finding insufficient causal connection between the use of a "jump vehicle" to jump start a stalled vehicle and injuries to the plaintiff caused by an uninsured motorist crossing lanes of travel); *Steelman v. Holford*, 765 S.W.2d 372, 375 (Mo. Ct. App. 1989) (finding auto exclusion in homeowner's policy did not apply where

This Court need only determine whether Plaintiff sufficiently alleged in its Complaint that it does not have a duty to defend or indemnify under the Policy because an exclusion applies. Here, Plaintiff pleads that the allegations in the Third-Party Petition demonstrate that the endorsement applies because the property damage arose out of the use of the R&H truck or the escort car, or both.[65] Plaintiff sufficiently pleads that the "arising out of" and "use" language in the endorsement unambiguously applies to these two vehicles. Defendants fail to advance any argument that the cargo was in "use" at the time of the occurrence.[66]

**B. Definitions of "Auto" and "Mobile Equipment"**

Defendants do not dispute that J&J's escort car and R&H's truck meet the Policy's definition of "auto" because they are each "[a] land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment."[67] That definition appears to plainly include attached equipment such as the water tank, although neither party addresses that. Therefore, the Court need not consider the "mobile equipment" definition, or whether the exclusion applies to the water tank to decide Defendants' motion. Plaintiff pleads sufficient facts to support its claim that the exclusion applies to the escort car or the truck based on the plain meaning of the words used in the endorsement and definition of "auto." Because the

---

vehicle was the situs of a firearm discharge; the use of the vehicle was temporally and spatially related, but not causally); *Ward v. Int'l Indem. Co.*, 897 S.W.2d 627, 6289 (Mo. Ct. App. 1995) (finding injuries from drive-by-shooting did not arise out of the use of a vehicle because it was merely the situs of the cause of the injury).

[65] *See Ryder Truck Rental, Inc. v. U.S. Fidelity & Guar. Co.*, 527 F. Supp. 666, 669 (E.D. Mo. 1981) ("[V]irtually every jurisdiction which has addressed the question has held that an accident involving a tractor-trailer unit 'arises out of' the use of both, regardless of which part of the unit was actually involved in the accident.").

[66] Defendants assert that the water tank was in fact a water truck, and that the water truck is "the equipment that needs to be considered when determining whether Penn-Star can avoid coverage under its 'auto exception.'" Doc. 33 at 5. As discussed earlier, the Court must evaluate Plaintiff's duty to defend and indemnify based on what is alleged in the underlying pleadings. Moreover, even assuming that the cargo was a water truck, Defendants fail to provide any cogent argument demonstrating its "use" caused the property damage in this case.

[67] Doc. 1-3 at 32, § V, ¶ 2.a.

Court is to determine ambiguity in light of the specific facts of the case, this should end the inquiry.[68]

Nonetheless, the Court addresses Defendants' argument that the endorsement is ambiguous on its face, even if it is not ambiguous as applied to the facts alleged in the Underlying Lawsuit. The definition of "auto" states that "mobile equipment" is not an "auto," and is separately defined. The "mobile equipment" definition provides that it does not include vehicles that are subject to financial responsibility laws. Neither the "mobile equipment" definition nor financial responsibility laws are at issue in this case. Yet, according to Defendants, the interplay between the auto exclusion, the endorsement, and the definitions are confusing and uncertain; thus, the endorsement should be deemed ambiguous and construed in light of the insured's reasonable expectations.

Defendants argue that the Policy requires the insured to take too many steps to determine whether a vehicle qualifies as "mobile equipment," pointing to the fact that the endorsement superseded the original auto exclusion, and then cross-references multiple definitions, one of which itself contains an exception. But "[d]efinitions, exclusions, conditions and endorsements are necessary provisions in insurance policies. If they are clear and unambiguous within the context of the policy as a whole, they are enforceable."[69] The mere fact that the Policy requires an insured to cross-reference definitions does not mean the endorsement is ambiguous.

Next, Defendants suggest that the mobile equipment exclusion renders the endorsement confusing and uncertain because it applies to property damage "arising out of . . . [t]he transportation of 'mobile equipment' by an 'auto' owned or operated by or rented or loaned to

---

[68] *See Strader v. Progressive Ins.*, 230 S.W.3d 621, 624 (Mo. Ct. App. 2007).

[69] *Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 163 (Mo. 2007) (en banc).

any insured."[70] Because the policy recognizes that "mobile equipment" is typically "transported by another vehicle not connected to J&J Pilot Cars," Defendants suggest that the water tank was "mobile equipment." There are several glaring problems with this argument. First, it fails to explain how the language of the exclusions and definitions is facially confusing or uncertain. Defendants' assertion that the auto exclusion endorsement is ambiguous is limited to its application to the water tank, an application this Court has found to be misplaced. Second, while the Court is required to read the language in the context of the policy as a whole, the mobile equipment exclusion has not been invoked by Plaintiff to deny coverage. The "mobile equipment" definition, not the exclusionary provision, plainly controls the meaning of "mobile equipment" in the definition of "auto," yet Defendants conflate the exclusion and definition for purposes of their ambiguity argument. Defendants fail to point to any provision of the "mobile equipment" <u>definition</u> that makes the Policy facially ambiguous. Finally, Defendants fail to explain why the mobile equipment exclusion would create a reasonable expectation of coverage given that it is an exclusionary provision. The Court finds no compelling reason to find that the language of the auto exclusion endorsement is facially ambiguous on the basis of language in the mobile equipment exclusion.

This leaves Defendants' request that the Court follow *Penn-Star Insurance Co. v. Zenith Insurance Co.*, a federal court decision construing the same policy under California law.[71] In that case, Penn-Star argued it had no duty to defend or indemnify in an underlying wrongful death case stemming from a collision between an automobile and its insured tractor that was pulling a tillage disc.[72] The issue was whether the auto exclusion applied either because the

---

[70] Doc. 1-3 at 23, § I, Coverage A, ¶ 2.h(1).

[71] 436 F. Supp. 3d 1367 (E.D. Cal. 2020).

[72] *Id.* at 1371.

tractor, despite being farm equipment, was excluded from coverage because it was subject to financial responsibility laws and therefore not "mobile equipment," or because the other automobile involved in the collision was an "auto" used by "any person."[73]

The Eastern District of California, applying California law, found that the provision in Penn-Star's auto exclusion endorsement limiting coverage for "mobile equipment" was ambiguous and unenforceable; therefore, it rejected Penn-Star's assertion that the auto exclusion barred coverage for the tractor.[74] Specifically, it determined that "the provisions limiting coverage for 'mobile equipment' in the Penn-Star policy are not conspicuous, plain, or clear as a matter of law."[75] The court further found no support for Penn-Star's claim that the auto exclusion applied because "the state court plaintiffs—who were *not* associated with, employed by, or otherwise connected to [the insured]—were traveling in an 'auto.'"[76] The court found such an interpretation turned the exclusion into an "unusual and unfair limitation[] of coverage that defeat[s] the insured's reasonable expectation of coverage."[77] In sum, the court determined that,

> Penn-Star policy's auto exclusion is not plain and clear enough to defeat Golden Labor's reasonable expectation that it was covered for claims arising out of its alleged negligence with respect to using, operating, and/or training others to use the tractor involved in the collision at issue here. Accordingly, the court rejects Penn-Star's interpretation of its auto exclusion and finds that Penn-Star may not rely on *that interpretation* to preclude coverage.[78]

---

[73] *Id.* at 1375.

[74] *Id.* at 1377–78.

[75] *Id.* at 1379.

[76] *Id.* at 1380.

[77] *Id.*

[78] *Id.* at 1383 (emphasis added).

The Court agrees with Defendants that *Zenith* is neither binding nor applicable to the facts of this case. The Court is not bound by the *Zenith* decision since it construes this policy language under California law, not Missouri law. And *Zenith* considered this Policy language as applied to a tractor that was subject to the "mobile equipment" definition. As explained above, that definition plays no role in this case. Because the court's holding in *Zenith* was limited to the positions taken by Penn-Star in that case—different positions than it takes in this case—it does not persuade this Court to find that the auto exclusion endorsement, as applied here, is ambiguous and unenforceable as a matter of law.

In sum, the Court finds that the language in the Policy's auto exclusion endorsement, as supplemented by the definition of "auto," is unambiguous as applied to the allegations in the Underlying Lawsuit. Plaintiff sufficiently pleads that it has no duty to defend or indemnify because this exclusion applies and, therefore, the motion for judgment on the pleadings is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants R&H Logistics, Inc.'s and Richard R. Smith's Motions for Judgment on the Pleadings (Docs. 16, 23) are **denied**. Plaintiff's Motion for Leave to File Sur-Reply (Doc. 34) is **granted**. Plaintiff shall file the surreply attached to its motion for leave within seven (7) days.

**IT IS SO ORDERED.**

Dated: March 22, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE